UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Gary Kearney,**
**Christopher R. Mulleavey,**
**and Kathleen Mulleavey**

      **v.**                            Civil No. 07-cv-149-JL
                                        Opinion No. 2008 NH 143
**Brenda Elias and**
**William H. Constant**


**MEMORANDUM AND ORDER**

Plaintiffs Gary Kearney, Christopher Mulleavey, and Kathleen Mulleavey, the purchasers of residential real estate in Franklin, New Hampshire, sued the seller, Brenda Elias, and her husband, William Constant, a real estate agent, seeking to recover damages for their failure to notify the plaintiffs about the presence of lead-based paint in the residence.  The plaintiffs claim that the defendants' failure to notify them was negligent and in violation of state and federal law.

This court has jurisdiction over this matter under 28 U.S.C. §§ 1331 (federal question) and 1332(a) (diversity of citizenship).

The parties have filed cross motions for summary judgment. The plaintiffs seek summary judgment as to liability on Counts I and VII, which allege violations of the Residential Lead-Based Paint Hazard Reduction Act of 1992, 42 U.S.C. § 4852d, against

the defendants.  The defendants seek summary judgment on all of
the plaintiffs' federal claims (Counts I, II, and VII), arguing
that the plaintiffs have failed to demonstrate damages
recoverable under 42 U.S.C. § 4852d(b)(3).  The defendants also
seek summary judgment as to Count IV, which alleges that Elias is
liable for negligent misrepresentation under state law.

     After hearing oral argument on the cross motions, and after
reviewing the parties' respective memoranda, objections,
affidavits, and reply briefs, and for the reasons stated below,
the plaintiffs' motion for summary judgment is granted as to
Count I and denied as to Count VII.  The defendants' motion is
granted as to Count IV and denied as to Counts I, II, and VII.


I.  **<u>APPLICABLE LEGAL STANDARD</u>**

     Under Federal Rule of Civil Procedure 56, a motion for
summary judgment will be granted "if the pleadings, the discovery
and disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."  Fed. R. Civ.
P. 56(c) (2008) (amended December 1, 2007); <u>see</u> <u>Celotex Corp. v.
Catrett</u>, 477 U.S. 317, 322 (1986) (decided under prior,
substantially identical version of the rule); <u>Anderson v. Liberty
Lobby, Inc.</u>, 477 U.S. 242, 247 (1986) (same).  "The object of
summary judgment is to pierce the boilerplate of the pleadings

-2-

and assay the parties' proof in order to determine whether trial is actually required." <u>Dávila v. Corporación de P.R. Para la Difusión Pública</u>, 498 F.3d 9, 12 (1st Cir. 2007) (internal quotation marks omitted).

In this context, a "fact is 'material' if it potentially affects the outcome of the suit . . . and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence." <u>Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.</u>, 103 F.3d 196, 199-200 (1st Cir. 1996); <u>see also</u> <u>Navarro v. Pfizer Corp.</u>, 261 F.3d 90, 93-94 (1st Cir. 2001).  In deciding whether summary judgment is proper, the court must view the entire record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor.  <u>Zyla v. Wadsworth</u>, 360 F.3d 243, 246 (1st Cir. 2004).  "Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed."  <u>Littlefield v. Acadia Ins. Co.</u>, 392 F.3d 1, 6 (1st Cir. 2004).

Where, as is the case here with the plaintiffs' motion for summary judgment on their § 4852d claims, "the party moving for summary judgment bears the burden of proof on an issue, he cannot prevail 'unless the evidence that he provides on that issue is <u>conclusive</u>.'"  <u>EEOC v. Union Independiente de la Autoridad de Acueductos y Ancantarillados de P.R.</u>, 279 F.3d 49, 55 (1st Cir.

-3-

2002) (quoting <u>Torres Vargas v. Santiago Cummings</u>, 149 F.3d 29, 35 (1st Cir. 1998)).

## II.  <u>BACKGROUND</u>

In 1997, the New Hampshire Department of Health and Human Services, Office of Health Management ("HHS") issued an Order of Lead Hazard Reduction (the "HHS Order") to Joe Griffith, the owner of a multi-unit dwelling at 18 West Bow Street in Franklin, New Hampshire.  The HHS Order resulted from an inspection by an HHS representative, initiated when a child living at the address was found to be lead-poisoned.  The HHS Order required Griffith to conduct a full inspection and to abate all lead exposure hazards, which included the paint on a number of surfaces in the interior of the property which were identified in an attached "Lead Investigation Survey Form."  HHS records indicate that Griffith ignored the HHS Order, as did all subsequent owners including Elias and, eventually, the plaintiffs.

In 2000, Elias purchased the property at a foreclosure auction.  She did not learn of the HHS Order, however, until she received a letter from HHS some time after the purchase.  The letter stated in reference to the property, in relevant part:

An Order of Lead Hazard Reduction was issued . . . .

The requirements of the Order were transferred with the property when it was sold to you . . .  [T]he Order remains outstanding . . . .  [T]he Federal Lead-Based

-4-

>    Paint Hazard Reduction Act, 42 U.S.C. [§] 4852d, . . .
>    requires sellers and landlords of most residential
>    housing built before 1978 to disclose all available
>    records and reports concerning lead-based paint and/or
>    lead-based paint hazards to purchasers or tenants at
>    the time of sale or lease . . . .

The letter also invited Elias to contact HHS for a copy of its

Order, which Constant, Elias's husband and real estate business

partner, subsequently did.  Elias states that she also spoke

with LuAnn Speikers of HHS, telling her about renovations Elias

had done to the property since she had purchased it.[1]  Elias

claims that Speikers responded that "nothing more" needed to be

done.  So Elias did nothing further.  HHS similarly did nothing

to see whether the Order had in fact been satisfied.

    Elias decided to sell the property in 2002.  It was listed

as an "exclusive agency listing," meaning that the owner

reserved the right to sell the property independently without

any commission to a real estate agent.  Though Constant was

initially identified as the "listing agent," the multiple

listing so designated a different agent who worked for Constant

and Elias, Heather Adams, as of August 29, 2002.

    Constant showed the property to the plaintiffs, who

eventually entered into a purchase and sale agreement with

---

[1]  These renovations were not intended to remediate lead-
based paint hazards, but, by Elias's own account, "to make the
building more rent-worthy."  They consisted largely of repainting
without removing the existing lead-based paint.

Elias.  Constant claims that he informed Christopher Mulleavey
about the history of the lead problems with the property in
showing it to him prior to the sale, but Mulleavey denies that.
And on a disclosure form, given to the plaintiffs as part of the
transaction, Elias stated that she had no knowledge, reports, or
records regarding lead-based paint or lead-based paint hazards
in the property.  The transaction closed in November 2002.

About a year later, the plaintiffs entered into a purchase
and sale agreement for the property with Paul and Virginia
Gissing.  While the plaintiffs were unaware of the HHS Order at
that time, Kearney received a copy of it in March 2006, prior to
when the transaction with the Gissings closed.  Kearney says
that he discarded the document without looking at it in detail
because it was sent to his property management company, K&M
Investments, which did not own the property.  He asked HHS for
another copy of the order on April 11, 2006.  But Kearney did
not disclose the existence of the HHS Order to the Gissings
prior to their purchase of the property, which closed on April
22, 2006.

The Gissings later learned of the existence of the HHS
Order from state officials, and subsequently threatened a legal
action against the plaintiffs to recover the costs of
compliance.  The plaintiffs ultimately entered into a settlement
agreement with the Gissings to pay $80,000 for a release of all

-6-

claims.  The agreement recites that the Gissings "secured two
estimates for the abatement of the lead-based paint from the
subject property for $59,870 and $94,500" and that the Gissings
also "suffered other financial losses including loss of rental
income and have incurred consulting fees and attorney's fees."

The plaintiffs then brought this suit against Constant and
Elias, alleging violations of § 4852d and the New Hampshire
Consumer Protection Statute, N.H. Rev. Stat. Ann. § 358-A:2, as
well as negligence and negligent misrepresentation under state
common law.  They seek treble damages in the amount of $240,000,
three times the $80,000 settlement paid to the Gissings.


**III.  <u>ANALYSIS</u>**

**A.   <u>The § 4852d Claims</u>**

**1.  <u>Liability</u>**

**a.  <u>Elias (Count I)</u>**

The Residential Lead-Based Paint Hazard Reduction Act
directs the Environmental Protection Agency to promulgate
regulations that, among other things, require that a seller or
lessor of housing offered for sale or lease, "before the
purchaser or lessee is obligated under any contract to purchase
or lease the housing," both "disclose to the purchaser or lessee
the presence of any known lead-based paint, or any known lead-

-7-

based paint hazards, in such housing and provide to the
purchaser or lessee any lead hazard evaluation report available
to the seller or lessor . . . ."  42 U.S.C. § 4852d(a)(1)(B).
The regulations so provide.  24 C.F.R. § 35.88(a)(3).  They
further provide that "[t]he seller or lessor shall provide the
purchaser or lessee with any records or reports available to the
seller or lessor pertaining to lead-based paint or lead-based
paint hazards in the target housing being sold or leased."[2]  Id.
§ 35.88(a)(4).

As an enforcement mechanism, the Act creates a private
right of action in a purchaser or lessee against a seller or
lessor:  "Any person who knowingly violates the provisions of
this section shall be jointly and severally liable to the
purchaser or lessee in an amount equal to 3 times the amount of
damages incurred by such individual."  42 U.S.C. § 4852d(b)(3).
But it is the regulations, rather than the Act itself, that is
the source of the enforceable disclosure obligations.  Sweet v.
Sheahan, 235 F.3d 80, 88 (2nd Cir. 2000).

---

[2]  "Target housing" is defined as "any housing constructed
prior to 1978, except housing for the elderly or persons with
disabilities (unless any child who is less than 6 years of age
resides in or is expected to reside in such housing) or any 0-
bedroom dwelling."  24 C.F.R. § 35.86.  It is undisputed that the
property in this case is "target housing" because it was built
before 1978 and no exceptions apply.

-8-

The plaintiffs argue that they are entitled to summary judgment on Count I, alleging that Elias violated 42 U.S.C. § 4852d in her individual capacity, and Count VII, alleging that Constant violated 42 U.S.C. § 4852d in his capacity as an agent, because the undisputed facts demonstrate that both defendants were aware of the HHS Order but failed to disclose it to the plaintiffs prior to their purchase, in violation of § 4852d.

It is undisputed that, despite having notice of the pending HHS Order and her obligations as a seller under § 4852d, Elias disclosed neither the HHS Order nor the lead-based paint hazards to which it referred to the plaintiffs before selling them the property.  These undisputed facts establish that Elias violated the Act's disclosure obligations in two ways.  First, she failed to "disclose to the purchaser ... the presence of [the] known lead-based paint, or [the] known lead-based paint hazards" indicated by the outstanding HHS Order.  Second, she failed to "provide to the purchaser ... [the] lead evaluation report available to [her]," namely, the "Lead Investigation Survey Form" appended to the HHS Order.  See 42 U.S.C. § 4952(a)(1)(B); 24 C.F.R. §§ 35.88(a)(3), (4).

Elias nevertheless argues that she could not have failed to disclose any "known lead-based paint hazards," based on her account that Spiekers, the HHS official, told Elias before she sold the property to the plaintiffs that "nothing more" needed

-9-

to be done to satisfy the HHS Order.  But even accepting this
claim as true, as the court must for purposes of the plaintiffs'
motion for summary judgment, would arguably eliminate Elias's
liability under the Act only for failing to disclose the hazards
themselves.  It would not affect her liability for violating the
Act's independent requirement that the seller "provide to the
purchaser . . . any lead hazard evaluation report available to
the seller."  See Pellegrini v. Cent. 21, No. 05-30077, 2007 WL
2219331, at *7 (D. Mass. July 20, 2007) (denying summary
judgment for defendants on § 4852d claim, despite fact that they
had disclosed presence of lead-based paint hazards, where
disputes remained as to whether they had provided the "lead
hazard information pamphlet" required by § 4852d(a)(1)(A)).
The defendants do not address this theory of liability in
opposing the plaintiffs' motion for summary judgment.

    In fact, in the sole case on which the defendants rely on
this point, the court entered summary judgment for the
plaintiffs on a claim under § 4852d premised on the same theory:
that the defendants had failed to provide the plaintiffs with a
report in their possession showing lead paint levels in the
property prior to their agreement to purchase it, despite the
defendants' knowledge of their obligation to do so.  Smith v.
Coldwell Banker Real Est. Servs., Inc., 122 F. Supp. 2d 267,
274-75 (D. Conn. 2000).  The court granted this relief because

-10-

the defendants came forward with no "evidence rebutting the
conclusion that [they] knowingly violated the Act by failing to
ensure the purchasers were timely provided a copy of the lead
paint report."  Id. at 274.  So too with the defendants here.
Because the undisputed facts conclusively show that Elias
violated the Act's mandate to provide the plaintiffs with a lead
hazard evaluation report available to her, the plaintiffs'
motion for summary judgment on Count I is granted.[3]


    **b.  Constant (Count VII)**

    In addition to regulations imposing disclosure requirements
on sellers and lessors, the Act also directs the EPA to enact
regulations that "require the agent, on behalf of the seller or
lessor, to ensure compliance with the requirements of" §§ 4852d.
28 U.S.C. § 4852d(a)(4).  The EPA has done so.  See 24 C.F.R. §
35.94.  Because only Elias, and not Constant, was a "seller" of
the property when the plaintiffs entered into the agreement to
buy it, Constant can be liable under § 4852d only if he was
acting as Elias's agent in that transaction.  The regulations
define "agent" as "any party who enters into a contract with a
seller or lessor, including any party who enters into a contract

---

    [3]  As discussed infra part II.B, the court rejects the
defendants' arguments for summary judgment in their favor on this
claim.

-11-

with a representative of the seller or lessor, for the purpose of selling or leasing target housing."[4]  Id. § 35.86.

The undisputed material facts do not demonstrate that Constant was an "agent" under 24 C.F.R. § 35.86.  The plaintiffs have failed to show any "contract," either express or implied, between Constant and Elias for the purpose of selling the property.  Indeed, the only evidence the plaintiffs have entered on this point is the fact that Constant was listed as a "listing agent" on a listing sheet for the property at some time prior to the sale.  This alone is insufficient to conclusively establish the existence of a contractual relationship between Constant and Elias.  Moreover, all of the relevant transactional documents recite that there was no agent for the sale.  While Constant's conduct in showing the property on his wife's behalf might support a finding of agency under common law principles, it does not suffice to establish the "contract . . for the purpose of selling" the property necessary to make him an agent, and to impose the corresponding duties, under § 4852d(a)(4).  The

_____

[4]  In the absence of any challenge to the validity of the EPA's interpretation of § 4852d in its regulations, this court will follow the agency's construction of the statute.  See In re Slater Health Ctr., Inc., 398 F.3d 89, 103 (1st Cir. 2005) (applying regulations as promulgated by an agency when neither party challenged them); see also Sullivan v. Greenwood Credit Union, 520 F.3d 70, 75 (1st Cir. 2008) (holding as a matter of statutory interpretation that a term's statutory definition trumps the term's definition at common law).

plaintiffs' motion for summary judgment on their § 4852d count against Constant is denied.

## 2.  __Damages__[5]

The parties have cross-moved for summary judgment on the issue of damages for the defendants' alleged § 4852d violations. The plaintiffs argue that, as a matter of law, they are entitled to recover three times the amount they paid in settlement of the Gissings' claims against the plaintiffs.  The defendants, however, argue that the cost of that settlement is not recoverable against them because it resulted from the plaintiffs' alleged violations of § 4852d in selling the property to the Gissings, rather than the defendants' alleged violations of § 4852d in selling the property to the plaintiffs. The defendants further argue that, even they could be liable for the costs of the settlement, factual disputes remain as to the reasonableness of those costs as a measure of damages, precluding summary judgment for the plaintiffs on that issue.

As noted supra, "Any person who knowingly violates the provisions of [§ 4852d] shall be jointly and severally liable to the purchaser or lessee in an amount equal to 3 times the amount

---

[5]  For purposes of the following discussion, the court will assume that the plaintiffs can establish that Constant violated his obligations as an "agent" under the Act.

of damages incurred by such individual."  42 U.S.C. § 4852d(b)

(3).  Neither the statute nor its implementing regulations

contain any definition of the phrase "damages incurred."  The

defendants' argument that the phrase excludes what the

plaintiffs paid the Gissings to settle their claim rests on the

assumption that the phrase implies some causal connection

between the violation of § 4852d and the damages in question.

The assumption is reasonable:  § 4852d(b)(3) cannot be read to

impose liability on a seller for a buyer's injuries that are

unrelated to the statutory violations at issue.

    Indeed, under well-established principles of statutory

construction, the common-law term "damages" in § 4852d(b)(3)

must be given its common-law meaning, due to the absence of a

different definition in the statute.  See Safeco Ins. Co. of Am.

v. Burr, 127 S. Ct. 2201, 2209 (2007).  A causal relationship

with the defendant's conduct is part of the common-law

definition of "damages":  "[a] pecuniary compensation or

indemnity, which may be recovered in the courts by any person

who has suffered loss, detriment, or injury, whether to his

person, property, or rights, through the unlawful act or

omission or negligence of another."  Black's Law Dictionary 351-

52 (5th ed. 1979) (emphasis added); see also Restatement

(Second) of Torts § 12A (1979) ("'damages' is used . . . to

-14-

denote a sum of money awarded to a person <u>injured by</u> the tort of

another") (emphasis added).

The court cannot say, however, that the plaintiffs' claimed

injuries here so lack any causal connection to the defendants'

violations of § 4852d that they cannot be liable for those

injuries as a matter of law.  There are genuine issues of fact

material to what would have happened if the defendants had

disclosed the lead hazard evaluation report to the plaintiffs

before they agreed to buy the property, as required by the Act.

Kearney has averred, for example, that the plaintiffs simply

would not have gone forward with their plans to purchase the

property, presumably to avoid the costs of remediating the

hazards.  The defendants argue, in essence, that the plaintiffs

were able to avoid those costs anyway by selling the property to

the Gissings without complying with the disclosure requirements

of § 4852d.  But, more accurately, the plaintiffs attempted to

do so, but their attempt was thwarted when the Gissings learned

of the lead hazards on the property subsequent to the purchase

and threatened to sue the plaintiffs for violating § 4852d,

leading the plaintiffs to pay the Gissings to settle that claim.

This sequence of events precludes the ruling, as a matter

of law, that the defendants' failure to comply with § 4852d did

not cause the plaintiff's injury in the form of their payment to

settle the Gissings' claim.  It can be argued that the

plaintiffs would not have faced that claim had they complied
with their own obligations under § 4852d, but it can also be
argued that the plaintiffs would not even have incurred those
duties in the first place had the defendants honored their own
obligations under the Act.  Furthermore, even if the plaintiffs
had made the required disclosures to the Gissings, it is a
reasonable inference on the record as it stands that they either
would have refused to buy the property or agreed to go through
with the transaction only if the plaintiffs agreed to remediate
the lead hazards first (or at least reduce the purchase price to
reflect the cost to the Gissings to do that work themselves).
In any of these scenarios, the plaintiffs would have suffered
some financial injury traceable to the defendants' own
nondisclosure.  Determining the relative likelihood of these
various outcomes, and the corresponding amount of loss to the
plaintiffs, are ultimately factual dilemmas for the jury.  See,
e.g., Wortley v. Camplin, 333 F.3d 284, 295 (1st Cir. 2003)
("Proximate causation and intervening cause are usually issues
for the jury to resolve.").

     The defendants' real argument seems to be that, since they
are no more culpable of violating § 4852d than are the
plaintiffs, it is unfair to allow them to recover under the
statute, particularly in an amount three times the amount of
their damages.  But the Act does not itself impose any bar on

-16-

recovery under these circumstances and, even at common law, this kind of "unclean hands" defense is available only against equitable relief, not claims for damages.[6]  See, e.g., 2 Dan B. Dobbs, Law of Remedies § 9.6, at 626-27 (2d ed. 1993).  Indeed, in considering analogous claims for common-law fraud, courts have rejected the "argument that a tort action for fraudulent misrepresentation against the seller of real property is somehow waived when the buyer in turn conveys the property to a third party."  Budunov v. Kutsev, 164 P.3d 1212, 1219 (Or. Ct. App. 2007); see also Clearview Concrete Prods. Corp. v. S. Charles Gherardi, Inc., 453 N.Y.S.2d 750, 754 (N.Y. App. Div. 1982); 37 C.J.S. Fraud § 117 (1994).

       The defendants do not provide any authority on this point. They rely on the decision of the court of appeals in Mason ex

_____

       [6]  There is a common-law rule that "[w]here a person has become liable with another for harm caused to a third person because of his negligent failure to make safe a dangerous condition of land . . . , which was created by the misconduct of the other or which, as between the two, it was the other's duty to make safe, he is entitled to restitution from the other for expenses properly made in the discharge of such liability, unless after discovery of the danger, he acquiesced in the continuation of the condition."  Restatement (First) of Restitution § 95 (1937).  But, assuming that the defendant's liability to the plaintiffs for their costs of discharging their own liability to the Gissings under § 4852d is analogous to this principle, and assuming further that § 4852d should be read to incorporate this rule--points on which the court does not rule at this time--the defendants have not argued, much less attempted to show as a matter of law, that the plaintiffs "acquiesced in the continuation of the condition" of the property under this rule.

rel. Heiser v. Morrisette, 403 F.3d 28 (1st Cir. 2005), for the proposition that "one should not expect [§ 4852d] to be an end-all or be-all answer to the damages arising from the failure to make a federally required disclosure." Mason, however, did not consider the scope of the damages available under § 4852d(b)(3), but simply whether it conferred a private right of action to the minor children of lessees injured by lead hazards in their apartment which were not disclosed by the owner as required by the Act.[7]  403 F.3d at 28.

In Mason, the court of appeals held that the children lacked standing to sue because "the plain language of the statute limits recovery under § 4852d(b)(3) to a 'purchaser or lessee,'" a limitation the court deemed "consistent with the purpose of the disclosure provision" to allow purchasers or lessors to make an informed decision as to whether to contract for property with lead-based paint hazards.  Id. at 31.  So Mason does not intimate that, when purchasers like the plaintiffs here are deprived of that opportunity, their damages should be limited in the way the defendants suggest.[8]

---

[7]  Coincidentally, the property in question in Mason, 18-A West Bow Street, Franklin, is right next to the property at issue in this case, 18 West Bow Street, Franklin.

[8]  The court in Smith, in rejecting the argument that § 4852(b)(3)'s "'knowingly violate' standard requires a showing of bad faith or willfullness," 122 F. Supp. 2d at 273, reasoned that "the automatic trebling of the plaintiff's actual damages

By the same token, however, the plaintiffs have provided no authority in support of their view that, because they were victimized by the defendants' failure to make the disclosures required by § 4852d, the plaintiffs are entitled to recover, as a matter of law, their settlement payment to the Gissings. Drawing again on the (perhaps imperfect) analogy to indemnification principles, see note 6, supra, a plaintiff seeking recovery from a defendant for the cost of settling a third party's liability against the plaintiff arising from the defendant's conduct must show (1) actual liability to the third party, (2) the absence of a good defense to that liability, and (3) that the amount of the settlement was reasonable.[9]   42

---

incurred . . . serves as an important incentive to those directly injured by the violation to seek compensation for their injury as well as their effort in enforcing the law." Id. at 274.   Thus, like the circuit in Mason, the court in Smith was not considering the scope of the damages available, but a different limitation on § 4852d(b)(3), namely, the scienter requirement.   In any event, there is authority contradicting the Smith court's "directly injured" gloss:   in enacting the regulation which mirrors § 4852d(b)(4), the EPA appears to have taken a less restrictive view of the damages recoverable, explaining, "This provision allows the purchaser or lessee to seek direct compensation for any damages incurred based on the seller's or lessor's noncompliance."   61 Fed. Reg. 9064, 9078 (Mar. 6, 1996) (emphasis added).   Finally, even assuming Smith was correct to suggest that recovery is restricted to "those directly injured by the violation," the record does not permit the conclusion, as a matter of law, that the plaintiffs were not "directly injured" by the defendants' nondisclosure, for the reasons already discussed.

[9]   This rule applies where, as here, the plaintiff has failed to notify the defendant of the third party's claim before settling it.   42 C.J.S. Indemnity § 28.

C.J.S. <u>Indemnity</u> § 28 (1994); <u>see also</u>, <u>e.g.</u>, <u>Gulf Grp.</u>
<u>Holdings, Inc. v. Coastal Asset Mgmt. Corp.</u>, 516 F. Supp. 2d
1253, 1262-63 (S.D. Fla. 2007); <u>St. Paul Fire & Marine Ins. Co.</u>
<u>v. Michelin Tire Corp.</u>, 298 N.E.2d 289, 292 (Ill. App. Ct.
1973); <u>Nat'l Union Fire Ins. Co. of Pittsburgh v. Red Apple</u>
<u>Grp., Inc.</u>, 767 N.Y.S.2d 68, 69 (N.Y. App. Div. 2003).

    The plaintiffs have come forward with sufficient evidence
on these elements to avoid summary judgment against them on the
issue of damages.  Though the plaintiffs' liability to the
Gissings under § 4852b has not been conclusively established,
given factual disputes as to when Kearney learned of the lead
hazards vis-a-vis the status of the parties' purchase and sale
agreement, neither can the court rule that the plaintiffs were
not liable to the Gissings or had a good defense to their claim
as a matter of law.  The plaintiffs have also come forward with
evidence, principally the affidavit of the Gissings' property
manager, tending to show that they suffered more than $80,000 in
losses as a result of the plaintiffs' nondisclosure and that the
settlement amount was therefore reasonable, particularly in
light of the damage multiplier contained in § 4852d(b)(3).  To
be sure, the defendants have responded with evidence to the
contrary, but the ultimate resolution of this conflicting
evidence presents a question for the jury.  <u>See</u>, <u>e.g.</u>, <u>Fashion</u>
<u>House, Inc. v. K mart Corp.</u>, 892 F.2d 1076, 1094-95 (1st Cir.

-20-

1989).  Neither party is entitled to summary judgment on the
issue of damages.

**B.     <u>The state-law claim against Elias "as a real estate agent"
         (Count IV)</u>**

     The plaintiffs allege state-law claims of negligent
misrepresentation against Elias in her individual capacity
(Count III) and in her capacity "as a real estate agent" (Count
IV) based on her statements "that there were no known lead-based
paint hazards or lead-based paint disclosures."  Count IV also
alleges that Elias "as real estate agent, made a
misrepresentation that said agent had informed the seller
(herself) of seller's obligation under 42 U.S.C. § 4852(d) and
is aware of her responsibility to insure compliance."

     The defendants move for summary judgment on the ground that
Elias cannot be liable as a seller and also as an agent for
failing to make a disclosure to herself as the seller.  Whatever
the merits of this theory as a metaphysical matter, the
plaintiffs have not defended this count in response to the
defendants' summary judgment motion, and have presented no
evidence that Elias acted as a real estate agent, as opposed to
the seller, in selling the property to the plaintiffs.  The
defendants are entitled to summary judgment on Count IV.

IV.  **CONCLUSION**

For the foregoing reasons, the cross-motions for summary judgment are granted in part and denied in part.  The plaintiffs' motion for summary judgment is granted as to Elias's liability on Count I.  The defendants' motion for summary judgment is granted as to Count IV.  The motions are otherwise denied.


**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge


Dated:  August 11, 2008

cc:  Finis E. Williams, III, Esq.
     James B. Kazan, Esq.